In re COYNE ELECTRICAL
CONTRACTORS, INC.,
Debtor.

Coyne Electrical Contractors,
Inc., Plaintiff,

v.

The United States of America, et
al. [including A–J Contracting
Company, Inc.], Defendants.

A–J Contracting Company, Inc.,
Third–Party Plaintiff,

v.

Alex Brown & Sons Incorporated, Amer-
ican Management Systems, Kellner
DiLeo & Co., Third–Party Defendants.

Bankruptcy No. 98 B 20787(ASH).
Adversary No. 98–5191A.

United States Bankruptcy Court,
S.D. New York.

Jan. 10, 2000.

Proskauer Rose LLP, By Sally L. Schneider, New York, for The Joint Industry Board of The Electrical Industry and Its Participating Funds.

Fritz & Miller, P.C., By Maranda E. Fritz, New York, for A–J Contracting Company, Inc.

### DECISION ON APPLICATION FOR PAYMENT UNDER LIEN LAW SECTION 71(2)(d)

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

At issue before me on the instant application is whether a New York Lien Law "trust fund" beneficiary's claim to priority payment of statutory trust fund amounts pursuant to Lien Law Section 71(2)(d) is preempted under Sections 514(a) and 502(a) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). The disputants are The Joint Industry Board of the Electrical Industry and its Participating Funds ("JIB"), who claim a priority right to payment pursuant to Lien Law Section 71(2)(d) from a pool of funds held by the debtor, and A–J Contracting, Inc. ("A–J"), a competing claimant who challenges JIB's priority assertion on the ground that ERISA preempts JIB from asserting such

a priority as an "alternative enforcement mechanism." As discussed below, I find that ERISA does not preempt JIB's assertion of priority under Section 71(2)(d) of the Lien Law.

### Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

### Facts

The facts underlying this application have been stipulated by JIB and A–J. A–J is a construction firm which contracted with Kellner DiLeo & Co., Alex Brown & Sons Incorporated and American Management Systems, respectively, to renovate office space on three separate projects (collectively, the "Three Projects"). A–J then subcontracted the electrical portion of this work to the debtor, and A–J was paid a total of $435,136 on account of the electrical work performed by the debtor on the Three Projects.

A–J also subcontracted electrical work to the debtor on an unrelated project (the "Concourse Project") which the debtor abandoned, forcing A–J to hire substitute subcontractors to complete the Project. A–J withheld the amounts payable to the debtor from the Three Projects on account of the losses it incurred in the Concourse Project. On September 16, 1999 this Court ruled that A–J is entitled to set off its $407,716 Concourse Project claim against the debtor's Three Projects' claims aggregating $435,136 against A–J, which would leave a balance of only $27,420 due from A–J to the debtor. However, the September 16 decision limits A–J's right of setoff to the extent of "any possible Lien Law obligation which [the debtor] may have to any of its obligees on account of

the three projects." The reason for this limitation is that, under the requirement of "mutuality" for setoff, A–J may not set off its debt to the debtor against the debtor's entitlement from A–J to the extent that third parties have rights in that entitlement that are superior to that of the debtor (*e.g.*, by reason of the Lien Law). A–J's setoff is therefore contingent upon the existence and validity of any Lien Law claims arising from the Three Projects.

JIB asserts just such a Lien Law claim. JIB's claim against the debtor arises as follows: The debtor was a member of the New York Electrical Contractors Association, Inc., which serves as the collective bargaining agent with the I.B.E.W. Local Union No. 3, AFL–CIO, and is obligated to pay certain benefits under the collective bargaining agreement with the union. The debtor employed union members on one of the Three Projects, the Alex Brown & Sons project. It is undisputed that the debtor is liable to JIB with respect to the Alex Brown & Sons project in the amount of $238,164.71 for unpaid benefits.

A–J and JIB do not dispute that the amounts received by A–J on account of the debtor's work on the Three Projects are "trust funds" within the meaning of the Lien Law. Neither does A–J contest that JIB has status as a lien law beneficiary. A–J does assert that JIB's assertion of priority with respect to its claim is preempted by ERISA.

### Discussion

"This is another Employee Retirement Income Security Act of 1974 (ERISA) preemption case." *De Buono v. NYSA–ILA Medical and Clinical Services Fund,* 520 U.S. 806, 808, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997). That the phrase "ERISA preemption" has become the poster child of federal litigation can be gleaned from the first footnote in the *De Buono* decision, noting (as of 1997) thirteen Supreme Court decisions on this issue since 1981 and as of

1992, over 2,800 opinion in the lower courts. This decision is yet another.

### Preemption Generally

■ While the topic of ERISA preemption in and of itself comprises a substantial body of law, it is helpful to review the function and development of federal preemption doctrine generally before turning to the particular operation of ERISA preemption. Congressional power to preempt state law derives from the Supremacy Clause under Article VI of the Federal Constitution. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), citing *Gibbons v. Ogden*, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23 (1824). "[T]he question whether a certain state action is preempted by federal law is one of congressional intent. " 'The purpose of Congress is the ultimate touchstone.' " *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). *See also Allis–Chalmers*, 471 U.S. at 207, 105 S.Ct. 1904; *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978); *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963).

> [The congressional] purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. *Pennsylvania R. Co. v. Public Service Comm'n*, 250 U.S. 566, 569, 40 S.Ct. 36, 63 L.Ed. 1142; *Cloverleaf Butter Co. v. Patterson*, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.

*Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). This style of preemption is the familiar "field preemption." Even in the absence of field preemption, specific or "conflict" preemption may occur. Thus, where:

> ... Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute. A conflict will be found "where compliance with both federal and state regulations is a physical impossibility ...," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or where the state "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *Jones v. Rath Packing Co.*, [430 U.S. 519,] 526, 540–541 [, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)]. Accord, *De Canas v. Bica*, 424 U.S. 351, 363, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976).

*Ray v. Atlantic Richfield Co.*, 435 U.S. at 158, 98 S.Ct. 988. *See also, Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) ("state law can be preempted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted, ... If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, ... or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress ...").

■ Such "[p]re-emption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " *Metropolitan Life Ins. Co. v. Massachu-*

*setts,* 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). *See also, Rath Packing,* 430 U.S. at 525, 97 S.Ct. 1305; *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

 Nevertheless, the Supreme Court has recognized inherent limitations in the preemption doctrine:

> As is always the case in our pre-emption jurisprudence, where "federal law is said to bar state action in fields of traditional state regulation, ... we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"

*California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). *See also, N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *Rice v. Santa Fe Elevator Corp., supra.* Similarly, state laws of general application which only incidentally effect the operation of a federal statute will not be preempted. *See De Buono,* 520 U.S. at 815–16, 117 S.Ct. 1747 and *Travelers,* 514 U.S. at 668, 115 S.Ct. 1671 ("Congress could not possibly have intended to eliminate" state laws having only an indirect effect "no different from myriad state laws in areas traditionally subject to local regulation").

### Preemption under ERISA

 Mindful of the Supreme Court's direction to consider preemption in light of the purposes of the federal statute, a brief examination of the overall function of ERISA is warranted. Congress crafted ERISA with the intent of protecting the interests of employees and their beneficiaries in employee benefit plans. While the statute does not mandate particular bene-fit schemes, it does govern employee benefit plan administration through rules regarding plan participation, vesting and funding, as well as imposing reporting, disclosure and fiduciary administration requirements. *Plumbing Industry Board v. E.W. Howell Co., Inc.,* 126 F.3d 61, 66 (2d Cir.1997); *Travelers,* 514 U.S. at 651, 115 S.Ct. 1671. The purpose, in turn, of ERISA preemption is to insure uniformity in benefits law and to reduce the "the administrative and financial burdens of compliance with conflicting state laws." *Plumbing Industry Board,* 126 F.3d at 66 (quoting *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)).

ERISA's preemption provision is found in Section 514(a), which states:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a). For quite some time, the key term of this preemption provision, "relate to," was taken in an almost literal sense, *see Shaw,* 463 U.S. at 96–97, 103 S.Ct. 2890, with the concomitant problem arising that almost any matter somehow touching upon ERISA, no matter how tangential, could fall within the ambit of "relate to." In 1995 the Supreme Court fashioned a significant doctrinal change with its *Travelers* decision (514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695) in which it "moved away from this form of 'uncritical literalism.'" *Plumbing Industry Board,* 126 F.3d at 66, citing *Dillingham.* Most significantly:

> [T]he Supreme Court has instructed that analysis under ERISA's preemption clause must begin with the "starting presumption that Congress does not intend to supplant state law" ... and admonished courts applying the preemp-

tion clause to "look ... to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." ... That look should be guided by common sense. *Id.* at 66–67, citing *De Buono* and *Travelers.* Thus, Section 514(a)'s preemptive effect is neither limitless nor can its "relate to" language be taken to mean literally any "relation to." The courts must

> ... avoid a construction that theoretically is unending, which the Supreme Court warned against when it turned away from "relate to" as a guide. Hence, to overcome the anti-preemption presumption, a party challenging a statute must convince a court that there is something in the *practical operation* of the challenged statute to indicate that it is the type of law that Congress specifically aimed to have ERISA supercede.

*Id.* at 67 (emphasis supplied). As noted in *De Buono:*

> In order to evaluate whether the normal presumption against pre-emption has been overcome in a particular case, we concluded that we "must go beyond the unhelpful text and the frustrating difficulty of defining its key term [*i.e.,* "relate to"], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive."

*De Buono,* 520 U.S. at 813–14, 117 S.Ct. 1747, citing *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671 and referring to *Dillingham.*

■ Thus, it will not suffice to merely invoke Marley's Ghost—in order to justify preemption the state law at issue must have some demonstrable, "practical" effect on the operation of ERISA in order to warrant preemption under ERISA Section 514(a). Courts have not hesitated to find such an effect where state law impacts, to borrow a phrase more familiar in this Court, "core" ERISA functions, such as calculation of pension benefits permissible under federal law, requiring employers to provide particular benefits, cases in which the existence of an ERISA pension plan is a critical element of a state law cause of action, or cases in which a state statute contains an explicit reference to ERISA or ERISA plans. *See De Buono,* 520 U.S. at 814–15, nn. 12–15, 117 S.Ct. 1747 and cases cited therein. Stated alternatively:

> The Supreme Court has identified several ways in which the anti-preemption presumption can be overcome. First, preemption will apply where a state law "refers to" ERISA plans in the sense that the measure "acts immediately and exclusively on ERISA plans" or where "the existence of ERISA plans is essential to the law's operation." ... Second, a state law is preempted even though it does not refer to ERISA or ERISA plans if it has a clear "connection with" a plan in the sense that it "mandate[s] employee benefit structures or their administration" or "provid[es] alternative enforcement mechanisms." ...

*Plumbing Industry Board,* 126 F.3d at 67, citing *Dillingham* and *Travelers.*

■ Significantly, however, once the practical effect of a state law falls outside these "core" areas of ERISA concern:

> the presumption against preemption is considerable—state laws of general application that merely impose some burdens on the administration of ERISA plans are not "so acute" as to force an ERISA plan to adopt certain coverage or to restrict its choice of insurers should not be disturbed.

*Id.,* citing *De Buono,* 520 U.S. at 816 and n. 16, 117 S.Ct. 1747.

■ It is within the confined subset of laws having a "connection with" ERISA plans insofar as they "provide an alternative enforcement mechanism" which A–J seeks to cast Lien Law Section 71(2)(d). The determination of whether Section 71(2)(d) provides an alternative enforcement mechanism entails an examination of both the text of Section 71(2)(d) and the meaning of the phrase "alternative enforcement mechanism."

Section 71(2)(d) of the Lien Law provides in relevant part:

The trust assets of which a contractor or subcontractor is trustee shall be held and applied for the following expenditures . . .

 (d) payment of any benefits or wage supplements, or the amounts necessary to provide such benefits or furnish such supplements, to the extent that the trustee, as employer, is obligated to pay or provide such benefits or furnish such supplements by any agreement to which he is a party;

*Id.* Section 71(2)(d) does no more than to specify which persons and entities are eligible trust fund beneficiaries and direct payment to them. Indeed, status as a trust fund beneficiary does not even require that a beneficiary be an actual mechanic's lienor. *See* Lien Law Section 71(4) ("Persons having claims for payment of amounts for which the trustee is authorized to use trust assets as provided in this section are beneficiaries of the trust whether or not they have filed or had the right to file a notice of lien . . . or shall have recovered a judgment therefor"). The purpose of Section 71 and generally of Article 3–A of the Lien law is to ensure that the statutory trust fund amounts would reach the intended beneficiaries, thus protecting "those whose skill, labor and materials made possible the performance of a construction contract." *Aquilino v. United States,* 10 N.Y.2d 271, 278, 219 N.Y.S.2d 254, 176 N.E.2d 826 (1961).

The provisions' objective was to see to it that the funds intended for construction of an improvement are in fact used only for that purpose, i.e., that the financing money raised by the owner is actually used for the cost of the improvement (see Lien Law, § 71, subd 1; § 2, subd 5), that the money paid or payable to the general contractor is used to pay the subcontractors, professionals, laborers and materialmen he has contracted with (see Lien Law, § 71, subd 2) and that the money paid or payable to subcontractors is used to pay the said persons he has contracted with (see Lien Law, § 71, subd 2). (See Aquilino v United States of Amer., supra, pp 275, 279; 1959 Report of N.Y. L. Rev. Comm. . . . pp. 209, 214.) The problem sought to be remedied was the diversion of said moneys to other uses since such diversion had the potential and often actual consequence of leaving one or more of said protected persons partially or wholly unpaid. . . . The trust assets of each trust were to be applied first to the payment of their respective beneficiaries, and diversions to other uses were prohibited (See Aquilino v. United States of Amer., supra).

*Teman Bros. v. New York Plumbers' Specialties Co., Inc.,* 109 Misc.2d 197, 199–200, 444 N.Y.S.2d 337, 340 (Sup.Ct.N.Y.Co. 1981) (quote taken from Westlaw). Significantly, these trust fund provisions merely ensure that obligations owed to trust fund beneficiaries are paid from trust fund amounts. Section 71 does not purport to create any new obligation.

The notion of "alternative enforcement mechanism," however, involves precisely the creation of an ERISA payment obligation in a non-ERISA party. In *Plumbing Industry Board,* the Second Circuit found that Section 5 of the Lien law (providing for a lien in favor of "[a] person performing labor or furnishing materials . . . and any trust fund to which benefits and wage supplements are due . . .") created an alternative enforcement mechanism to that found in ERISA because:

it requires a general contractor—absent any ERISA requirement that he do so—to assume responsibility for the subcontractor-employer's benefit obligations. Because the state law impermissibly adds to the exclusive list of parties ERISA holds responsible for an employer's benefit obligations, it cannot stand.

*Plumbing Industry Board,* 126 F.3d at 69, citing *Romney v. Lin,* 105 F.3d 806, 812 (2d Cir.1997), *cert. denied,* 522 U.S. 906,

118 S.Ct. 263, 139 L.Ed.2d 189 (1997) (referred to as *"Romney II"*). Similarly, in *EklecCo v. Iron Workers Locals 40, 361 & 417 Union Sec. Funds,* 170 F.3d 353, 356 (2d Cir.1999), the preemption of a lien under Section 3 of the Lien Law (functionally the equivalent to Section 5), was affirmed "because that section also creates an alternative enforcement mechanism that (in this case) makes EklecCo—the property owner—liable for the ERISA obligations of U.S. Bridge as employer." *Id.* at 357.

Both *Plumbing Industry Board* and *EklecCo* found that the respective provisions of the Lien Law at issue in those cases were preempted as "alternative enforcement mechanisms" to the "comprehensive civil enforcement scheme" set out in Section 502(a) of ERISA. It must be said, however, that this Court is at a loss to discern much of a scheme or indeed much comprehensiveness in ERISA Section 502(a). At best the statute appears to grant a claim to an aggrieved ERISA beneficiary to recover or enforce benefits due, to compel an ERISA administrator to supply information, or to prosecute fiduciary violations of an ERISA administrator.

The ultimate origin of the phrase "alternative enforcement mechanism" is likewise opaque. One is left to wonder how an alternative can exist when the statute is remarkably vague as to who is a proper defendant under Section 502(a) in the first instance. Nevertheless, these issues need not be decided on this application. The Second Circuit has pronounced that the fixing of ERISA liability upon a non-ERISA party creates an "alternative enforcement mechanism"—yet there is no such shifting of liability here. The debtor/employer, Coyne, has admitted its liability for the trust fund amounts. Section 71(2)(d) confirms that liability to JIB—it creates no new obligation payable by someone other than the employer. Indeed, Section 71(2)(d) explicitly provides for payment "to the extent that the trustee, *as employer,* is obligated to pay or provide

such benefits ...." There is no claim that any party other than the debtor is liable to JIB for trust fund amounts. Section 71(2)(d) neither alters the proper ERISA obligee nor does it have any effect on the ERISA obligation other than as a means of ensuring collection of a pre-existing liability against the employer. Thus no "alternative enforcement mechanism" exists.

On the facts of this application, Section 71(2)(d) operates wholly independently of ERISA, having no practical effect on any aspect of ERISA concern. Section 71(2)(d) is no more than a "state law[ ] of general applicability." *See De Buono,* 520 U.S. at 815, 117 S.Ct. 1747. JIB seeks to assert a statutory priority to payment as against A–J's setoff amount. While it happens that JIB is incidentally an ERISA beneficiary, JIB's assertion to priority in payment in no way alters or impacts ERISA plan administration. The operation of Section 71(2)(d) is essentially no different from that of the Georgia garnishment statute addressed in *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), in which the Supreme Court held that state law judgment collection procedures do not conflict with the remedies set out in ERISA Section 502:

ERISA does not provide an enforcement mechanism for collecting judgments won in either of these two types of actions [actions against a plan or actions on behalf of a plan]. Thus, while § 502(d), the "sue and be sued" provision, contemplates execution of judgments won against plans in civil actions, it does not provide mechanisms to do so. Moreover, Federal Rule of Civil Procedure 69(a), which would apply when either type of civil suit discussed above is brought against an ERISA plan in federal court, defers to state law to provide methods for collecting judgments.... Consequently, state-law methods for collecting money judgments must, as a general matter, remain undisturbed by ERISA; otherwise, there would be no

way to enforce such a judgment won against an ERISA plan. If attachment of ERISA plan funds does not "relate to" an ERISA plan in any of these circumstances, we do not see how respondent's proposed garnishment order would do so. . . .

*Id.* at 833–34, 108 S.Ct. 2182. If collection by attachment and garnishment is not preempted by ERISA Section 514(a), then *a fortiori* JIB's application under Section 71(2)(d) to collect the ERISA benefits admittedly owed its constituents is not preempted. *See also, Mason Tenders Dist. Council Welfare Fund v. Logic Construction Corp.,* 7 F.Supp.2d 351, 357 (S.D.N.Y.1998) ("*Romney* thus demonstrates that ERISA ... provides uniform federal rules as to who is liable ... and to what extent ... and a federal forum for determination of liability. It is not concerned with the means by which ERISA liabilities are collected").

For the foregoing reasons, JIB's assertion of its priority rights under Lien Law Section 71(2)(d) is not preempted by ERISA Section 514(a).

■ Finally, and not without significance although the issue was not briefed by the parties, to the extent that the $238,-164.71 owed JIB represents Lien Law trust funds, equitable ownership of those funds resides in JIB as a Lien Law beneficiary, and the debtor holds, at best, bare legal title. As such, those funds did not become property of the debtor's estate under Section 541(d) of the Bankruptcy Code. *In re Westchester Structures,* 181 B.R. 730, 736–37 (Bankr.S.D.N.Y.1995) (debtor has no property interests in funds held in trust for Lien Law beneficiaries); *In re Dunwell Heating & Air Conditioning Contractors Corp.,* 78 B.R. 667, 670 (Bankr.E.D.N.Y.1987) ("[T]he beneficial interests of subcontractors and materialmen held by the debtor in a statutory trust are not property of the debtor or of the bankruptcy estate").

The parties are directed to submit an order, agreed upon as to form, consistent with this decision.